ELLIS, Judge.
The defendant, Greater Baton Rouge Consolidated Sewerage District, is a governmental unit established and managed by the City-Parish government of the Parish of East Baton Rouge and the City of Baton Rouge to facilitate the construction and operation of sanitary sewerage facilities, *526 and will be hereinafter referred to as the “District.” The plaintiff is the contractor who was engaged in the construction of a sewerage trunk line along Sherwood Forest Boulevard and Engineer Depot Road, and will be hereinafter referred to as the “Contractor.” Continental Insurance Company is a third party defendant, and is the insurer of the consulting engineers, Parsons Brinckerhoff, Quade and Douglas.
The subject of this litigation arises out of that project, which appropriately bears contract number S-13. The Contractor’s demands may be divided into two claims for extra work, as follows:[1]
Claim for $9,000.80 for extra work consisting of compacting soil along Engineer Depot Road to 95% density.
Claim for $20,968.50 representing money spent by the contractor in an unsuccessful attempt to meet the specified infiltration test, which test was later waived. '
The record in this case contains over five hundred pages of testimony and a total of eighty-four documentary exhibits. This court is indebted to all counsel for very excellent briefs which have been of material assistance in the determination of this case.
This court will first consider the claim for $9,000.80 for additional compaction along Engineer Depot Road. The trial court gave judgment in favor of the Contractor on this demand.
The written contract between the District and the Contractor provided trenches in highways and streets were to be backfilled and compacted to a density of not less than 95% of a specified standard. The term “compaction” refers to the pressing and compression of the loose earth as it is replaced in the trench. The greater the compaction, the less settling the replaced fill will do at a later date. Ninety-five per cent compaction is accomplished by tamping- or beating the loose earth either manually or with air tamps in layers of about six inches until the top of the trench is reached. Normal compaction is achieved in the same-way except the layers of earth replaced may be up to twelve inches in thickness.
The contract further provided trenches, not in streets were to be compacted in the normal manner without regard to the percentage of compaction.
Subsequent to the awarding of the S-13'. contract, it was determined by the Department of Public Works for the City-Parish government that trenches located in street right-of-ways but not on the improved' street itself ought to be compacted to 95% of density, as anything less might endanger the life of the street and require extensive-repairs at an early date. As the contract was thought to be ambiguous with regard to the percent of compaction required of trenches in rights-of-way, a price of $1.60 per linear foot for additional compaction along Sherwood Forest Boulevard and Engineer Depot Road was negotiated with the Contractor. The work along Sherwood. Forest Boulevard was then in progress and: the additional compaction there was performed and paid for as the work progressed..
Prior to the time the pipe laying operation-reached Engineer Depot Road, the District determined to move the proposed trench-located over an additional seven feet from-the edge of Engineer Depot Road, making-a total of seventeen feet between the trench and the pavement, so additional compaction would not be necessary along this road.
This information was communicated by-Mr. C. W. Hair, project engineer employed: by the Department of Public Works for *527 the City-Parish, to Mr. James Best, then employed’ by the Contractor as job superintendent. Mr. Best denies receiving this information and stated even if he had received it, he would have disregarded it because Mr. Hair was only the project engineer and not the consulting engineer, and was therefore without any authority to order such a change.
Mr. Hair’s testimony, however, is supported by an entry in his diary for August 11th, 1960. It is likewise supported by two important facts: That no written work order was ever issued for the additional compaction along Engineer Depot Road and that the trench along that road was actually cut seventeen feet from the edge of the pavement as specified by Mr. Hair.
In addition, whether or not Mr. Hair had authority to make such a decision is immaterial. Certainly, the Contractor would have proceeded at his own peril after having been duly informed by the project engineer of a decision of this magnitude. If Mr. Best doubted Mr. Hair, he had only to call Mr. Hardin, the representative of Parsons, Brinckerhoff, Quade & Douglas in charge of the Baton Rouge office maintained by the consulting engineers.
Therefore, the Contractor cannot recover for the additional compaction along Engineer Depot Road, having been specifically ordered not to do the work which was never formally ordered, but which was certainly contemplated and discussed.
There is a second reason why the contractor cannot recover for additional compaction along Engineer Depot Road. A letter dated September 1, 1961 from Mr. Frank J. McConnell, President Pro Tempore of the Consolidated Sewerage District, introduced by the Contractor as exhibit Number P-38, discloses an agreement worked out as between the District and the Contractor. The actual agreement was supported by various testimony also.
The agreement, entered into because there may have been some confusion as to whether or not the additional compaction work should have been performed along Engineer Depot Road, provided the Contractor should be paid $1.60 per linear foot for compaction along Engineer Depot Road if in fact the additional work had been performed. In order to determine if the work had been done, it was agreed that soil borings would be made and tests conducted to determine the actual compaction as of the present time. It was thought these results would indicate whether or not the original compaction was actually 95%, though it was agreed they would not accurately show the actual compaction at the time the trenches were filled. The soil testing work was evidently to be done by Pittsburgh-Laboratories, but there is no indication as to who was to arrange for the tests or who was to bear the expenses.
On the trial of the case, the Contractor introduced a report of Shilstone Testing Laboratory which indicated that on August 1, 1961 at several points along the two sewer lines in question, the percentage of proctor, which we understand to be another way to express compaction, varied from 79% to 105.8%. These tests were made only to a depth of six inches, however, and the trenches had been cut to depths of up to twenty feet, with an average depth of about fifteen feet. These tests, according to the testimony of Mr. Traylor and Mr. Mahan, employees from the testing laboratory, are of absolutely no value in determining the compaction below twelve inches, but that deeper tests could have been made. Nor are the tests indicative of the initial compaction of the top six inches as this is the part that would be most affected by climatic conditions.
The burden of proof is upon the Contractor (plaintiff) to establish by a preponderance of the evidence that he is entitled to the relief sought. This he has failed to do. The evidence disclosed the testing laboratory was assisted in making the tests which were made by Mr. Best, *528 the contractor’s job superintendent. Certainly, the plaintiff had ample opportunity to have Shilstone, or some other laboratory, make meaningful tests.
In allowing recovery on this item, the trial judge placed the burden of proof on tlie District (defendant) to show the compaction was not actually done on Engineer Depot Road. This is clearly in error. Regardless of who ordered the Shilstone test or who paid for it, the plaintiff must prove his case.
The District offered the testimony of Mr. Harry E. Russell and Mr. William H. Miller, two City-Parish inspectors who stated they were the inspectors on the job and that the compaction along Engineer Depot Road was not the same as that along Sherwood Forest Boulevard. The trial judge indicated he placed little faith in the credibility of Mr. Russell. Nevertheless, this Court is of the opinion the Contractor has failed to sustain the burden of proving the work was actually done.
It is clear from the evidence that the negotiated price of $1.60 per linear foot for additional compaction was agreed to by the contractor when it -was fairly contemplated by all parties this additional compaction would be done along Sherwood Forest Boulevard and Engineer Depot Road as well, and that the trenches along the Boulevard were deeper than those along the Road, requiring more compaction and hence, more cost. Therefore, this court will not foreclose the Contractor’s right to seek a renegotiated price for the compaction work along Sherwood Forest Boulevard or to bring an action to be paid according to the value of the services actually performed along- Sherwood Forest Boulevard.
The Contractor’s second claim is for $20,968.50 expended in efforts between December 30, 1960 and June 15, 1961, the date of final acceptance of the job, to meet the infiltration standard specified in the written contract. Of this amount, the trial judge allowed '$9,996.58.
The contract specifications provided that “At no point in any sanitary sewer lines shall the leakage of ground water into the system exceed an amount calculated on the basis of 300 gallons per day per mile per inch of diameter of sewer mains contributing to the flow at the point in question.”
On December 30, 1960 all pipe was in the ground and backfilled. However, the evidence tended to show the Contractor had considerable work to do in repairing obvious leaks and cleaning the lines and the ground surface before the contract could have been accepted, regardless of the result of the infiltration test.
The infiltration test conducted on December 29, 1960 indicated the line was not acceptable. Actually, with the possible exception of a test on part of the line conducted privately and not witnessed by the appropriate District inspectors, the line never did meet the contract specifications relative to maximum allowable infiltration.
There were many reasons for this failure. The concrete pipe and rubber gaskets used were evidently somewhat defective. Some pipe was rejected at the plant and more after delivery to the job site. The manufacturer actually repaired many of the joints after the pipe was buried, this work taking place after April 12, 1961.
A second reason for the high infiltration rate was the uncommonly excessive rainfall which plagued this operation, and caused the ground water to exert excessive pressures on the pipe.
The District contends once the pipe was in the trench the Contractor did not backfill it immediately, thus allowing the joints to slip apart. The Contractor contends the manholes were improperly designed and sank, causing the joints nearest these manholes to be pulled apart. Evidence introduced tends to sustain both of those contentions.
We are also inclined to agree with the trial judge’s observation that at the start of the contract, everyone concerned was a *529 novice. This is explained by the fact the pipe being used was a new design, the construction crew inexperienced, and all the engineers, though competent, were not familiar with main sewer trunk line construction, especially in this area.
About April 11, 1961 the consulting engineers assigned Mr. Clarence M. Swei-gart to clear up the difficulty then existing on this particular project. Mr. Sweigart testified when he visited the job on April 12, 1961 there was still some patching to be done on the lines to eliminate obvious leaks, and there were hanging gaskets which were later repaired by the pipe manufacturer.
It is the contention of the contractor that the infiltration test was improper and the engineers should have realized this sooner and thus avoided the expenditure of the $20,968.50 claimed herein.
The Contractor bases his claim on a letter written by Mr. W. H. Bruce, Jr., a partner in the firm of consulting engineers, on November 29, 1961 to Mayor John Christian, from which wc quote as follows:
“* * * in an attempt to attain an infiltration test rate which was later determined by the Consulting Engineer to be in excess of the intent of the specifications. This determination was based upon recognition of the use of porous backfill as required in the Boulevard neutral ground by the Department of Public Works and the saturated ground conditions and excessive head of water above the level of the sewer during construction. * * * If this interpretation of the infiltration requirement had been made earlier it is reasonable to assume that the extra work * * * would have either been unnecessary or reduced in scope. * * Since the specifications were later interpreted by the Consulting Engineer in the light of the specific conditions in which the line was being constructed, we do not believe the contractor should be expected to bear this added expense.”
We find no merit in this contention.
In the first place, the contractor is put in the impossible position of claiming reimbursement for his expenses in meeting a contract requirement which he actually never did meet.
There is no real dispute as to the propriety of this specific infiltration requirement as a general matter. It is the same test requirement used in all such construction contracts in the Baton Rouge Consolidated Sewerage District and has been successfully met in other such projects supervised by the District, and even by the plaintiff Contractor himself, Mr. E. A. Hardin, a representative of the Consulting Engineers who prepared the specific specification dealing with the infiltration requirement described the test as “ * * * just about as good a test as could be adopted. It is not extreme, nor is it lenient * * * and it is in line with what is being used with this type of joint * *
The consulting engineer who recommended acceptance of the line though the infiltration rate test had not been met, testified as follows:
“Because in my opinion the line had been repaired and fixed to the best of their ability. They had stopped all visible leaks, they had performed, I would say, the requirements by this time of the contract, and there seemed to be no point in pursuing it any further. The matter of whether the leakage was a few gallons more than the limit of the requirements, I would say, was a matter of judgment based on the fact that during this spring it was one of the rainiest springs in history, it was a very rainy spring, and the ground water was high, considerable higher than the four feet which the quantity was based on actually and, in fact, I think it was practically eight feet in general, but to require, I mean to make measurements that would actually prove that would have required a great deal of work in the field and subject to *530 question still, so it was a matter of judgment, that due to the conditions and due to the fact that the sewer was visible tight and due to the fact also that this leakage was not of tremendous quantity, it was a reasonable quantity anyhow, we felt that there was no use in pursuing the matter further, and we could accept the line as meeting the intention, shall we say, of the contract requirements.”
We cannot attribute the same significance to the letter of Mr. Bruce as does the Contractor. Mr. Bruce in his letter was commenting on the reasons why the Consulting Engineer (Mr. Hardin) had recommended acceptance though the infiltration test had not been met. However, the best evidence of that is Mr. Hardin himself, and his statement is quoted above. Actually Mr. Bruce did not say the test was improper, tie simply said the engineers had determined to interpret the specification in the light of the existing natural conditions and thus justify acceptance in spite of the fact the line failed to meet the infiltration rate test. There was no needless expenditure by the contractor to meet the infiltration test per se for the record abounds with evidence that expenditures necessarily had to be made by the contractor in order to correct many defects in the line through which water was entering. Such defects were not corrected completely until approximately May 2, 1961.
Certainly the test was not impossible. It appears the contractor began his job with an inexperienced crew, he had difficulty with the pipe, and nature showered him with misfortune in the form of a record breaking rainfall. None of these conditions can be attributed to the District. In the exercise of professional judgment the consulting engineers recommended acceptance of the project after the contractor had remedied the multitude of defects in the line.
This Court finds that the Contractor is not entitled to reimbursement for his expenses between December 30, 1960 and June 15, 1961 as those expenses were necessary and proper itnder the contract to meet the requirements of the contract and for the further reason that not all the work required under the contract had been performed until sometime late in April or early May when the joints were repaired by the manufacturer.
For these reasons, the claim for reimbursement for expenses in meeting the infiltration test must also be denied.
The judgment of the trial court is reversed and the plaintiff’s suit is dismissed at his costs.
Reversed.

. The original petition filed by the Contractor also sought compensation for extra work performed in removing a gas line and for replacing pipe on Goodwood Avenue which sank. The trial judge properly disallowed both of those items on the ground that they had. not been sufficiently proven. The record is practically bare of evidence in support of those two items and they- were not; pressed before this court.